UNITED STATES of America, Appellee,

v.

Paul W. GIBSON, Defendant, Appellant.

No. 83–1154.

United States Court of Appeals,
First Circuit.

Argued Nov. 7, 1983.

Decided Jan. 30, 1984.

Certiorari Denied April 30, 1984.
See 104 S.Ct. 2174.

Albert. F. Cullen, Jr., Boston, Mass., with whom Robert V. Carr, and Cullen & Wall, Boston, Mass., were on brief, for defendant, appellant.

William C. Bryson, Atty., Dept. of Justice, Washington, D.C., with whom William F. Weld, U.S. Atty., and Diane M. Kottmyer, Sp. Atty., Dept. of Justice, Boston, Mass., were on brief for appellee.

Before CAMPBELL, Chief Judge, ROSENN,[*] Senior Circuit Judge and BOWNES, Circuit Judge.

[*] Of the Third Circuit, sitting by designation.

1. 18 U.S.C. § 1951(a) provides:
    Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires

BOWNES, Circuit Judge.

Defendant-appellant, Paul W. Gibson, appeals a jury conviction for attempting to obstruct commerce by means of extortion under 18 U.S.C. § 1951(a) (Hobbs Act).[1] Gibson asserts reversible error, raising five issues on appeal: (1) the trial court committed error in denying a motion for judgment of acquittal; (2) there was a constructive amendment to the indictment; (3) the trial court's jury instruction on reasonable doubt; (4) the trial court erred in not giving instructions on the defendant's theory of defense; and (5) defendant was erroneously denied exculpatory evidence relevant to sentencing and punishment.

We affirm.

We review the evidence in the light most favorable to the government. *United States v. Morris,* 700 F.2d 427, 432 (1st Cir.1983), *cert. denied,* —— U.S. ——, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. Winter,* 663 F.2d 1120, 1127 (1st Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983).

During the relevant period, defendant was the business manager of Roofers Local Union 33. The person extorted was Thomas A. Guilderson, co-owner of Advanced Industrial Systems, Inc. (AIS), a Massachusetts roofing company.

In September of 1982 AIS was working on a $129,800 roofing job in Rhode Island; its employees were nonunion. On September 30, Guilderson received a message from his answering service to call defendant at the office of the Roofers Union. Guilderson called defendant, who questioned him as to the size of the Rhode Island job and then told Guilderson that he had "a problem." Defendant said that the business agent for the Providence Roofers Union, Arthur Cramer, was upset because AIS was nonunion. Defendant then offered "to take

so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

care" of the "problem" for a "consideration." Guilderson said that he was not aware of any problem, that he would think about it and get back to defendant. Defendant insisted that Guilderson call him the next morning with an answer.

Guilderson promptly called his attorney. He then went to the job site and, after consulting with his partner, removed all of the company's valuable tools from the site so as to safeguard them against vandalism. The next morning Guilderson had his wife call the defendant and tell him that he could not call him back until the following Monday, October 4.

On Monday Guilderson met with two FBI agents and agreed to have his conversation with Gibson recorded. The pertinent parts of the conversation are as follows:

> Gibson (referring to Cramer): That's right and he wanted (laugh) just to walk in and try to harass ya and stop ya and do whatever the hell he could for the job. OKay.
>
> Gibson: And I said that I could take care of him, perhaps.
>
> Guilderson: So if I say no I say I don't want to do anything about it.
>
> Gibson: (unintell) that he has to do what he has to do.
>
> Guilderson: Then then then Creamer gonna go ahead and do what he thinks he has to do to ah
>
> Gibson: Right ya
>
> Guilderson: To give us a problem
>
> Gibson: Right
>
> Guilderson: But ah but if I deal with you, you can get hm off my back, is that it?
>
> Gibson: Well, you won't deal with me, what you do is deal with him.
>
> Guilderson: Oh, I'll deal with him.
>
> Gibson: Right
>
> Guilderson: Alright so we are, alright so okay
>
> Gibson: (unintel) he doesn't know you and I happen to know you but ya you will deal through me for him ya, probably, I don't know how he would want to handle that.

Further into the conversation, a meeting was arranged for the next day at Linda Mae's Restaurant in Dorchester. When Guilderson asked how much money he should bring, defendant said that Guilderson should make an offer and he would decide if it was enough. Guilderson offered $500. Defendant then put Guilderson on hold and falsely claiming to have Cramer on another line said, "I got him on the other line, can you make it seven and a half?" The amount of $750 was agreed upon. The following exchange then took place:

> Guilderson: Well, let me ask you this, is that gonna take care of my problem?
>
> Gibson: That's gonna eliminate it.
>
> Guilderson: It's gonna eliminate my problem.
>
> Gibson: Uh, huh
>
> Guilderson: Alright
>
> Gibson: Do you know what you are doing here?
>
> Guilderson: Do I know what I'm doing?
>
> Gibson: Ya
>
> Guilderson: I don't seem to have much choice here do I?
>
> Gibson: Ya

During the call defendant said that Guilderson could fight but "I don't know how much [disputed word] he can give you." Guilderson testified that the word not faithfully reproduced was "violence." Defendant claims it was "problems." Near the end of the conversation defendant assured Guilderson that he "can guarantee ya the job is free and clear of any problems."

Guilderson wore a concealed recorder for the payoff meeting which took place in defendant's car near the restaurant. There was the following exchange:

> Guilderson: Let me ask you a question, all right let me ask you a question all right? You're a good guy and all like that right? You're doin me a favor on this alright?
>
> Gibson: I hope I am.
>
> Guilderson: Well, what I'm saying is
>
> Gibson: That I am as far as that job is
>
> Guilderson: What I'm saying is ahm I don't want to find out that ah you know

this guy didn't get taken care of or whatever. How will I know you know that he isn't

Gibson: The guy ain't gonna come and kiss you and say Tommy

Guilderson: That's not what I'm talking about you know what I mean.

Gibson: The guys taken care of. The guy is taken care of.

Guilderson: Okay.

Toward the end of the encounter Guilderson transferred the $750 to Gibson, and the following transpired:

Guilderson: Somebody ... whoever, that's your business. Okay you want the money? You want to count it. (paper rustling)

Gibson: Nope, I can't fucken trust you I would say "where does Tom live?"

Guilderson: Uhm, uhm you mean if the money wasn't there what? You'd say where do I live?

Gibson: Yeah, I'd say "where does Tom live?" or "let me call him up and find out where the hell he lives" and what have you.

Guilderson: Uh, uh

When Guilderson again expressed concern about the Rhode Island job, the defendant said: "Let me tell you something there's nothin going to happen to that, okay? When I said to you this morning I guarantee this job, I can't guarantee you know six months down the road or three months down the road there."

After Guilderson left the car, defendant was arrested.

*The Motion for Judgment of Acquittal*

■ Our review of the district court's decision to deny a motion for acquittal is quite limited; we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any rational trier of fact of the defendant's guilt beyond a reasonable doubt. *United States v. Cincotta*, 689 F.2d 238, 241 (1st Cir.1982), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). *See also United States v. Weisz*, 718 F.2d 413, 438 (D.C.Cir.1983).

■ Defendant argues that his use of the word "problem(s)" in his conversations with Guilderson meant picketing or other legal union activities. It is well-known that picketing may engender violence to persons and to property. It is for this reason that the Hobbs Act excludes from its reach "the use of force to achieve legitimate labor ends." *United States v. Enmons*, 410 U.S. 396, 401, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379 (1973); *United States v. Jacobs*, 543 F.2d 18, 21 (7th Cir.1976), *cert. denied*, 431 U.S. 929, 97 S.Ct. 2632, 53 L.Ed.2d 244 (1977); *United States v. Quinn*, 514 F.2d 1250, 1257 (5th Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976).

If the reference to "problem" in the first conversation had not been coupled with a pointed suggestion that the "problem" could be solved for a consideration, there might be some force to defendant's contention. Any payment received by Gibson for taking care of the "problem" could not have been demanded in pursuit of a legitimate labor objective. *See United States v. Quinn*, 514 F.2d at 1258–59.

■ Guilderson understood Gibson's offer to solve his company's "problem" for a consideration as a threat of violence to himself and to company property. He promptly moved to meet his perceived threat of vandalism by removing or securing all of the valuable tools at the job site. We think that the jury could properly infer that Gibson's use of the word "problem" plus his demand for a payoff to solve the problem was deliberately calculated to raise the spectre of violence.

The subsequent recorded conversations also suggested that unless a payoff was made violence was a definite possibility. Defendant's language certainly does not convey the message that the "problem" to be solved was picketing. Defendant never used the word "picketing." The word "problem(s)," albeit vague, has an ominous connotation. The connotation of violence was heightened, not dispelled, by the subsequent conversations.

The district court's denial of the defendant's motion for acquittal was soundly based.

*Constructive Amendment to the Indictment*

■ The question is whether the trial court's instructions to the jury so differed from the indictment as to constructively amend it. To prevail on a constructive amendment to the indictment theory, appellant must show: (1) that he was tried on a charge different from the one in the indictment; or (2) that he was not informed of the nature and cause of the accusation. *United States v. Kelly*, 722 F.2d 873 at 876 (1st Cir.1983).

Defendant's argument starts with the indictment:

2. From on or about September 30, 1982 to on or about October 4, 1982, the defendant, Paul W. Gibson, did knowingly, willfully and unlawfully attempt to obstruct, delay and affect commerce by means of extortion in that the defendant, Paul W. Gibson, did attempt to obtain money of A.I.S. from an officer of A.I.S., with said officer's consent, induced by the wrongful use of fear of economic harm to A.I.S. and physical harm to the person of said officer and his family in that the defendant threatened that violence would be done to the business of A.I.S. and that physical harm and violence would be done to said officer and his family unless such payment was made.

■ Defendant asserts that the charge to the jury was in conflict with the indictment

and "created the impression that picketing along with personal payoff may be sufficient to convict." The jury instruction was framed in terms of 18 U.S.C. § 1951(b)(2), a definitional section of the Hobbs Act which reads in relevant part, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear ...." The trial court correctly explained the extortive act: exacting a personal payoff from another to eliminate any union activity on the Rhode Island job site; and the means by which the act was accomplished: threatened violence against the business and the person of others.[2]

The court did not, as defendant contends, give misleading instructions allowing the jury to find defendant guilty if they believed that he had threatened picketing or other legitimate labor action. As already pointed out, defendant never used the word "picketing" and his choice of words could reasonably be inferred to connote physical violence.

Defendant was not tried on a charge different from the one in the indictment and he was fully informed of the nature of the accusation.

*The Instruction on Reasonable Doubt*

The challenged instruction was as follows:

If the government fails to prove the defendant guilty beyond a reasonable

2. The instruction was as follows:

It has not been suggested by anyone here in the case that a union official may exact payments to himself personally to guarantee labor peace. Unions have all sorts of legitimate rights under the law and, indeed, under the Constitution, but persons connected with the union may not bargain away those rights for personal gain. A union leader may not say: We won't picket if you pay me personally a sum of money. There may be a perfect right under the law for the union to picket, but that is the right that is preserved by the law, and there is no right, and, indeed, the Hobbs Act forbids, if other essential elements are proved, officials taking money for their own purposes, that is, lining their own pockets in order to preserve labor peace or to

prevent lawful activity by the union, and that is part of the government's allegation that is, that the defendant knew of the vulnerability to union activity of the Guilderson company down in Rhode Island and he exploited it, it is the government's allegation, by telling Guilderson that he could take care of it if he paid him some money.

Well, if the intent on behalf of the defendant was to do that, was to get a personal payoff by means of exploiting Guilderson's fear of violence to the job in Rhode Island or personal harm to his family, and if you have the impact on interstate commerce and the other essential elements that I have and will be describing, then if the government proves that beyond a reasonable doubt it has proved its case.

doubt, the jury must acquit him. Proof beyond a reasonable doubt is a phrase used in everyday conversation and it does not need extensive or elaborate definition. It is a reasonabale doubt based upon reason and common sense and arising from the state of the evidence.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.

There are very few things in this world that we know with absolute certainty and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. *If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty. If two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, the jury should adopt the one of innocence.* (Emphasis added.)

This instruction is part of a pattern jury instruction on reasonable doubt formulated by the Federal Judicial Center. *Pattern Criminal Jury Instruction § 21,* Federal Judicial Center (1982).

Defendant argues that the phrase "on the other hand" improperly led the jury to believe "that [it] could convict either because [it was] firmly convinced, based on the evidence, that he was guilty, or because [it] did not think there was a real possibility that he was not." Thus, it is contended, the instruction invited the jury to shift the burden of proof from the government to the defendant to show that there was a real possibility that he was not guilty.

Appellant's argument proves once again that any attempt to define "reasonable doubt" will probably trigger a constitutional challenge. *See United States v. Drake,* 673 F.2d 15, 20–21 (1st Cir.1982), for a compendium of cases in this circuit involving attacks on definitions of reasonable doubt. It can be said beyond any doubt that the words "reasonable doubt" do not lend themselves to accurate definition.

■ Although we think that the sentence beginning with "If, on the other hand" might possibly engender some confusion as to the burden of proof if it stood by itself, it is clear that when the charge is read as a whole, there was no error. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The district court also instructed the jury: "The burden of proving the defendant guilty beyond a reasonable doubt rests upon the government. This burden never shifts throughout trial. The law does not require a defendant to prove his innocence or for that matter to produce any evidence." This was sufficient to dispel any possible confusion or misunderstanding arising from the reasonable doubt definition.

*Failure to Instruct on Defendant's Theory of Defense*

■ Defendant alleges that the trial court incorrectly refused to give his requested instruction setting forth his theory of defense. We recognize that, generally, "a party is entitled to a specific instruction on his theory of the case." 2 C. Wright & A. Miller, Federal Practice and Procedure § 428 at 689 (1982); *see United States v. Brake,* 596 F.2d 337, 339 (8th Cir.1979). The refusal to give a particular requested instruction, however, is reversible error only if "the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." *United States v. Grissom,* 645 F.2d 461, 464 (5th Cir.1981). The trial court's charge to the jury need not follow the exact form and wording of the defendant's proposed instructions. *United States v. Morris,* 700 F.2d 427, 433 (1st Cir.1983), *cert. denied,* —— U.S. ——, 103 S.Ct. 2128, 77 L.Ed.2d

**875**

1306 (1983); *United States v. Gaines,* 690 F.2d 849, 855 (11th Cir.1982); *United States v. Skinner,* 667 F.2d 1306, 1310 (9th Cir. 1982); *United States v. Brake,* 596 F.2d at 339; *United States v. Westbo,* 576 F.2d 285, 289 (10th Cir.1978).

■ We have carefully read the charge and conclude that each of the seven points of appellant's theory of defense [3] was clearly and adequately covered. First, in regard to defendant's first and third theories of defense, the trial court charged, *inter alia,* "The Hobbs Act then does not, for example, condemn the use of coercive measures to obtain wage increases or to carry out a collective bargaining agreement, if there is an agreement between union and an employer." The second theory of defense was also covered by the district court: "Unions have all sorts of legitimate rights under the law and, indeed, under the Constitution . . . . [T]here may be a perfect right under the law for the union to picket, but that is the right that is preserved by the law . . . ." Later in the instructions, the trial court correctly defined theories four through seven in its description of what constitutes legitimate labor activities, the elements of an 18 U.S.C. § 1951 violation, and the government's burden of proof.

The jury instructions were clear, comprehensive, complete, and accurate. Defendant's contention that the charge negated his "ability to present a given defense" is without merit.

*Exculpatory Evidence*

A week before the sentencing date defense counsel moved that the government produce "any and all information in its possession which is favorable to the defendant on the sentencing issue." The statements of seven named individuals who either testified before the grand jury or were interviewed by the FBI agents were requested. The motion stated that it was Gibson's understanding that these named individuals "spoke well of the defendant and knew of no criminal conduct." The motion further alleged that this information and similar statements the government might have "would assist the defendant and his counsel in preparing and presenting to the court an appropriate report regarding his character and the circumstances surrounding his behavior which would be helpful in imposing sentence."

We agree with the district court that this attempt to dredge something favorable out of the government files does not come within the letter, intent, or spirit of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ We think the court's sentencing procedure was eminently fair. It refused to consider evidence offered by the government of prior similar misconduct by defendant. It carefully read and took into consideration a large number of letters attesting to defendant's good character. The court rejected the government's recommendation of a three-year sentence and imposed a one

---

**3.** Appellant's seven-point theory of defense is set forth in condensed form below:

[1] A threat to do what party making threat has a legal right to do does not constitute duress or coercion.

[2] Picketing peacefully and truthfully is lawful means of advertising organized labor's grievances to the public and right guaranteed by Constitution as incident of free speech.

[3] Threats to do only what party making them has a lawful right to do are not unlawful.

[4] Labor union members may bring such lawful pressure to bear as is within their control to induce non-union employees to join them.

[5] There is an exception to the statute. You may not convict a labor union official of

a violation of this statute if he is pursuing legitimate objectives of organized labor.

[6] Paul W. Gibson contends he accepted the money on behalf of the union and that his goals of either obtaining work for the members of his union or of obtaining compensation to his union for the agreement not to exercise its legitimate rights are legitimate goals of organized labor.

[7] The government must prove beyond a reasonable doubt that the defendant Paul Gibson was using coercive means (duress) to exact a personal payoff. If you find that the payment or delivery of money was made in compromise, settlement and release of a claim, grievance or dispute in the absence of duress, you must find that defendant not guilty.

year sentence. Its reasons for the sentence were stated fully in the record.

There was no error in the sentencing process.

*Affirmed*