**Kenneth E. MURPHY, Appellant,**

v.

**Manfred HOLLAND, Warden, WV Penitentiary, Appellee.**

No. 84–6526.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1985.

Decided Oct. 28, 1985.

Blaise Supler, Third Year Law Student, Post-Conviction Assistance Project, University of Virginia School of Law (Stephen A. Saltzburg, Charlottesville, Va., on brief), for appellant.

J. Bradley Russell, Asst. Atty. Gen., Charleston, W.Va. (Charles Brown, Atty. Gen., Charleston, W.Va., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

The petitioner, Kenneth E. Murphy, appeals from the district court's denial of his petition for a writ of habeas corpus. Murphy first argues that a jury instruction defining reasonable doubt given at his 1980 trial in the Circuit Court of Braxton County, West Virginia violated his right to due

process by unconstitutionally lessening the State's burden of proving his guilt beyond a reasonable doubt. Murphy also asserts that the admission of inculpatory statements made by him to the police violated his sixth amendment right to counsel and his fifth amendment protection against compulsory self-incrimination. Although disturbed by what we believe were unnecessary and probably unwise jury instructions on reasonable doubt, we cannot conclude that they deprived Murphy of his constitutionally safeguarded right to a fair trial. We also find that Murphy's fifth and sixth amendment rights were not compromised by the admission of his confessionary statements. Accordingly, we affirm denial of the writ.

## I.

### Procedural History

On March 6, 1980, Murphy was convicted in the Circuit Court of Braxton County, West Virginia, of first degree murder for fatally shooting Patricia Dennison. He was sentenced to life imprisonment with parole eligibility. Some three years later, on February 3rd and May 20th, 1983, Murphy's attorney filed a direct appeal and an amended petition for appeal in the West Virginia Supreme Court of Appeals. On that appeal, Murphy's most substantial allegations of error consisted of the same fifth and sixth amendment claims he now asserts entitle him to federal habeas corpus relief. The appeal was promptly denied without opinion. Murphy next proceeded *pro se* and *in forma pauperis* by petitioning the West Virginia Supreme Court of Appeals for a writ of habeas corpus on July 7, 1983. Murphy's writ was denied on October 13, 1983.

Continuing to press his constitutional claims, Murphy petitioned the district court for federal habeas corpus relief on February 17, 1984. The case was referred to a federal magistrate who recommended denial of Murphy's habeas corpus petition. On

July 31, 1984, the district court adopted the magistrate's recommendation and denied the writ.

## II.

### Factual Background

Sometime on January 9, 1980, Patricia Dennison was fatally shot with a 20-gauge shotgun at her home. The shot was fired in a downward angle from behind and the bullet entered her head slightly in front of the right ear. The actual cause of death was asphyxiation resulting from the complete occlusion of Dennison's breathing passages by the blood, tissue, and shotgun pellets that had lodged in her throat following the shotgun blast. Although Murphy admitted at trial that only he and his infant son were in Dennison's house when the shooting occurred,[1] he argued that Dennison had committed suicide by shooting herself. However, the angle of the shot and location of the bullet wound eliminated suicide as a possible cause of Dennison's fatal wounding.

The apparent motivation behind the shooting was Murphy's desire to prevent Dennison from informing the police that he had stolen her $254.00 welfare check. Dennison's daughter testified that during an argument a few days before the murder she heard her mother say to Murphy: "I know you know where my check is and what happened to it." (JA 548). The check was cashed on January 2, 1980, and it contained apparent endorsements from Murphy and Dennison. A handwriting expert testified, however, that Murphy had forged Dennison's signature.

Nevertheless, the most condemning evidence against Murphy consisted of two extremely inculpatory statements he made to the police. After waiving his *Miranda* rights, Murphy partially confessed: "I admit I stold [sic] the check out of the mail box and cashed it, but I didn't kill her." (JA 730). Later, Murphy blurted out a

---

1. The lack of tire imprints in the fresh snow surrounding Dennison's home on the day she was shot supported Murphy's admission that

only he and his infant son were in the house when the shooting occurred.

complete confession to the police only seconds after he had identified Dana Cutright as the one who killed Dennison. According to Deputy Robinson of the Braxton County Sheriff's Department:

> Mr. Murphy mumbled something, which I believed him to say 'He didn't do it, I did.' I then asked Mr. Murphy to repeat what he said and he replied, 'Alright, I did it, Dana didn't have anything to do with it.'

(JA 734). After finding that Murphy had validly waived his *Miranda* rights before these statements were made, the trial court admitted them into evidence over Murphy's objection. In addition to challenging the jury instructions on reasonable doubt, Murphy claims that the admission of these inculpatory statements violated his right to counsel under the fifth and sixth amendments.

### III.

### Reasonable Doubt Jury Instructions

Once again, we are called upon to determine the propriety of a trial court's jury instruction on reasonable doubt under the fifth amendment's ubiquitous shield of due process which embodies the fundamental notion that an accused is presumed innocent until the state proves his guilt beyond a reasonable doubt. Though our decisions reflect a clear and consistent disapproval of efforts to define reasonable doubt,[2] trial courts have repeatedly expressed their unwillingness to dispense with their traditional practice of charging the jury on reasonable doubt. Whether trial courts have overlooked the plain message of our decisions or are perhaps inseparably wedded to the unfortunate tradition of instructing the jury on reasonable doubt we cannot say.

But in the sanguine hope that some trial courts may someday heed our suggestions, trial courts are again urged to adopt what we think is the better practice by declining to define reasonable doubt in their jury instructions. *Moss,* 756 F.2d at 333. The term reasonable doubt itself has a self-evident meaning comprehensible to the lay juror. That subjective meaning is hardly susceptible to significant improvement by judicial efforts to define reasonable doubt with unattainable precision. Instead of improvement, the most likely outcome of attempts to define reasonable doubt is unnecessary confusion and a constitutionally impermissible lessening of the required standard of proof. *Id.; United States v. Gibson,* 726 F.2d 869, 874 (1st Cir.1984). To protect the accused's due process rights and avoid supplying the grounds for unnecessary constitutional challenges, *Gibson,* 726 F.2d at 874 ("any attempt to define 'reasonable doubt' will probably trigger a constitutional challenge"), the wisest course for trial courts to take is to avoid defining reasonable doubt in their instructions unless specifically requested to do so by the jury. Nevertheless, the mere attempt to instruct the jury on reasonable doubt does not constitute a per se constitutional violation warranting reversal on collateral attack. *Smith,* 718 F.2d at 1276. Consequently, our inquiry here is directed at whether, and to what extent, the instructions given in this case may have led the jury to evaluate

---

**2.** On direct appeal, we recently reiterated our disfavor of trial court attempts to explain reasonable doubt to the jury:

> Recognizing that little can be gained from attempts to define reasonable doubt, while admitting that added confusion is often created by these well-intentioned judicial efforts, we join in the general condemnation of trial court attempts to define reasonable doubt in their jury instructions.

*United States v. Moss,* 756 F.2d 329, 333 (4th Cir.1985); *United States v. Love,* 767 F.2d 1052, 1060–61 (4th Cir.1985) (direct appeal). Likewise, on collateral review, the majority in *Smith*

*v. Bordenkircher,* 718 F.2d 1273, 1276 (4th Cir. 1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2355, 80 L.Ed.2d 828 (1983), observed that "[w]e share [the uniformly] disapproving view" of trial court instructions on reasonable doubt. Other courts have been no less condemning of trial court efforts to enlighten jurors on the concept of reasonable doubt. *Whiteside v. Parke,* 705 F.2d 869, 871 (6th Cir.), *cert. denied,* 464 U.S. 843, 104 S.Ct. 141, 78 L.Ed.2d 133 (1983); *United States v. Martin-Trigona,* 684 F.2d 485, 493 (7th Cir.1982); *Dunn v. Perrin,* 570 F.2d 21, 23 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978).

Murphy's guilt under a reasonable doubt standard below that commanded by the Constitution.

### A.

### The Standard of Review

■ At the outset, we recognize that challenged jury instructions "may not be viewed in artificial isolation, but must be viewed in the context of the overall charge."[3] *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *accord Smith,* 718 F.2d at 1276. On collateral attack of a state conviction, the role of the reviewing court is limited and the inquiry is narrow. *Smith,* 718 F.2d at 1276. More precisely, "the question in . . . a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous or even universally condemned.'" *Id.* (quoting *Cupp,* 414 U.S. at 146, 147, 94 S.Ct. at 400, 401) (citations omitted). Unless the jury instruction renders the trial "fundamentally unfair," there is no entitlement to habeas corpus relief. *Cooper v. North Carolina,* 702 F.2d 481, 483 (4th Cir.1983).

### B.

### Application of the Standard of Review

■ Murphy limits his challenge of the jury charge to instructions two, three, and four. The portion of instruction number two to which Murphy objects informed the jury that

**3.** A single instruction cannot be artificially severed from the rest of the trial court's jury charge and judged by itself under the requirements of the fifth amendment because

a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

[a] reasonable doubt does not mean a vague, fanciful or imaginary doubt. It means doubt based on reason . . . a doubt for which a reason can be given. . . . A reasonable doubt is such that, were the same kind of doubt interposed in the graver transactions of life, it would cause a reasonable and prudent man to hesitate and pause.

(JA 841). An instruction that a reasonable doubt is "a doubt for which a reason can be given" merely conveys what is already axiomatic from the plain meaning of those very words. Except in rare cases,[4] a doubt for which *no* reason can be given is an *unreasonable* doubt. While such a definition does nothing to advance the jury's understanding of reasonable doubt, it in no way undermines or destroys their common sense appreciation of that term's meaning.

It is thus not surprising that courts have consistently held that an instruction declaring to the jury that reasonable doubt must be based on a reason does not overstep the constitutional boundaries erected by the fifth amendment. *Robinson v. Callahan,* 694 F.2d 6 (1st Cir.1982) (instruction that reasonable doubt is "a doubt for which you can give a reason" is not constitutional error); *United States v. Cruz,* 603 F.2d 673, 675 (7th Cir.1979) (instruction that reasonable doubt is "a doubt founded on reason" held not to be error in a direct appeal); *see also United States v. Muckenstrum,* 515 F.2d 568, 570 (5th Cir.1975) (instruction that reasonable doubt must be "based on reason and common sense" found not to be error in a direct appeal).

*Cupp,* 414 U.S. at 147, 94 S.Ct. at 400. Obviously, therefore, the effect of an assertedly erroneous instruction can only be determined by scrutiny of the entire trial and jury charge.

**4.** In some cases, jurors may harbor substantial doubt concerning an accused's guilt but also may be unable to articulate a specific reason for their uncertainty. *See Smith,* 718 F.2d at 1279 (Murnaghan, J., dissenting). But even if we assume that Murphy's case is one of these rare cases, other instructions on reasonable doubt removed any confusion that might have resulted from this portion of the trial court's instruction. *See infra* discussion.

Murphy also challenges the second part of instruction number two defining reasonable doubt as that kind of doubt which would cause a reasonable person "in the graver transactions of life ... to hesitate and pause." We recently refused to hold that the negative version of this instruction on reasonable doubt required reversal on direct appeal. *Moss* 756 F.2d at 333–34 (instruction that the reasonable doubt standard requires such proof "that you would be willing to rely upon it without hesitation in your most important affairs" is not reversible error). Consequently, we conclude that the challenged portions of instruction number two did not deprive Murphy of his right to a fair trial.

Challenged instruction number three explained reasonable doubt to the jury in the following fashion:

> The doubt which will justify an acquittal must be actual and substantial, not a mere possible doubt, because everything relating to human affairs and depending on oral evidence is open to some possible or imaginary doubt.

(JA 842). The Supreme Court has remarked in dictum that defining reasonable doubt as " 'substantial doubt, a real doubt' ... though perhaps not itself reversible error, often has been criticized as confusing." *Taylor v. Kentucky*, 436 U.S. 478, 488, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978). This court observed in *Smith* that the substantial doubt instruction on reasonable doubt "standing alone has never to our knowledge provided the basis for federal habeas corpus relief." 718 F.2d at 1277; *accord Payne v. Smith*, 667 F.2d 541, 547 (6th Cir.1981); *Hatheway v. Secretary of Army*, 641 F.2d 1376, 1384 (9th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Dunn*, 570 F.2d at 23. Because of various ameliorating instructions given in *Smith*—especially one cautioning that a conviction requires the exclusion of "every reasonable hypothesis but that of guilt"—we held that the substantial doubt language used to explain reasonable doubt did not unconstitutionally lessen the standard of proof. *Id.*

Here, the trial court gave the same saving "reasonable hypothesis" instruction to the jury. Moreover, the trial court contrasted "actual and substantial" doubt with a "mere possible doubt" in the same sentence. By emphasizing that reasonable doubt is not a "mere possible doubt" after stating that such doubt must be "actual and substantial," the confusion that the latter language might have caused standing alone was largely mitigated, if not totally eliminated. As a consequence, we are also convinced that instruction number three did not "by itself so [infect] the entire trial that [Murphy's] resulting conviction violates due process." *Cupp*, 414 U.S. at 147, 94 S.Ct. at 400.

Murphy's final objection to the trial court's jury charge is directed at instruction number four which reads in pertinent part:

> If, from all the evidence, the jury only believe [sic] it is possible, or that it may be, or that perhaps the Defendant is not guilty, this degree of uncertainty alone would not amount to such a reasonable doubt as to entitle the Defendant to an acquittal. All that is required for a conviction is that the jury should believe from all the evidence beyond a reasonable doubt that the Defendant is guilty.

(JA 843). In this instruction, the trial court plainly attempted to convey to the jury that the reasonable doubt standard does not require the removal of all possible doubt from their collective mind before they are entitled to convict. That reasonable doubt does not demand absolute certainty is unmistakably self-evident. Interpreting reasonable doubt to require the removal of *all* doubt would result in the imposition of a standard of proof on the state that could never be met, that no court has yet embraced, and that the Constitution has never been thought to require.

While capable of improvement, instruction number four achieved its modest goal of emphasizing to the jury that a reasonable doubt cannot be based solely on the abstract "possibility of innocence" if each juror is otherwise convinced of the defend-

ant's guilt. *United States v. Conley*, 523 F.2d 650, 655 (8th Cir.1975). At least three of our sibling circuits have approved variations of the general theme in instruction number four. *Gibson*, 726 F.2d at 874 (1st Cir.) (reasonable doubt does not require "absolute certainty" or "proof that overcomes every possible doubt"); *United States v. Ivic*, 700 F.2d 51, 69 (2d Cir.1983) ("it is proper to instruct that beyond 'reasonable' doubt does not mean beyond all 'possible' doubt"); *United States v. Alonzo*, 681 F.2d 997, 1002 (5th Cir.1982) (instruction that "it is not necessary that the defendant's guilt be proved beyond all possible doubt" is proper). Therefore, we hold that the trial court's decision to charge the jury that reasonable doubt is not synonymous with all possible doubt was unwise, not unconstitutional.

■■■ Besides arguing that each challenged instruction by itself constituted constitutional error, Murphy asserts that the cumulative impact of these instructions entitles him to habeas corpus relief. Reading the jury charge as a whole, however, we believe that the three challenged instructions neither individually nor collectively lessened the standard of proof under which Murphy's guilt was evaluated by the jury. We cannot overlook ameliorating instructions that accompanied the challenged reasonable doubt instructions and which were obviously heard by the jury's attentive ear. Those curative instructions provided the jury with the following guidance:

> The court instructs the jury that *the accused is presumed to be innocent* and that such presumption goes with him through all the stages of the trial until the State, upon which the burden of proof rests, has shown beyond a reasonable doubt, that the Defendant is guilty.

> . . . . .

> The Court instructs the jury that if you believe that there is any conflict as to any material evidence in the case, a part of which tends to establish his innocence, and the jury has a reasonable doubt as to which is true, the jury is instructed that it is their duty ... to adopt the evidence,

the theory and conclusion which is most favorable to *the Defendant since [he] is entitled to the benefit of every reasonable doubt as to his guilt or innocence of the crime charged against him.*

> . . . . .

> The court instructs the jury that all facts necessary to constitute the offense charged in the indictment must be proved beyond a reasonable doubt.... To justify a verdict of guilty in this case the evidence must not only be inconsistent with the Defendant's innocence, but *it must be of such character to exclude every reasonable hypothesis save that of guilt.*

(JA 840, 865, 867) (emphasis added). We have found similar instructions to remove any possible confusion on the part of jurors that might have resulted from a trial court's attempt to define reasonable doubt. *Moss*, 756 F.2d at 334 (*presumption of innocence* instruction served to clarify reasonable doubt definition); *Smith*, 718 F.2d at 1277 (poor reasonable doubt definition cured by instruction that reasonable doubt requires the exclusion of every *reasonable hypothesis* except that of guilt).

■■■ Here, we are again satisfied that these ameliorative instructions ensured that the jury determined Murphy's guilt under the proper standard of proof. The trial court apparently read to the jury *every* reasonable doubt instruction offered by Murphy and the State. While accommodating to the parties, the end result of this approach was a hodgepodge of reasonable doubt definitions that consumed several typewritten pages. But however unwanted and unhelpful such a practice may be, it is not for this reason unconstitutional. Less than perfect jury instructions are not enough to justify habeas corpus relief. Although we candidly concede that defining reasonable doubt hardly aids the jury in its attempt to understand and apply the concept of reasonable doubt, we cannot say that all of these jury instructions—when viewed together—deprived Murphy of his right to due process under the fifth amendment. Our decision in no way endorses

any of the challenged instructions and we remain unwavering in our belief that trial courts should refrain from charging the jury on reasonable doubt unless such guidance is made unavoidable by a specific request from a confused jury.

## IV.

### Admission of Murphy's Inculpatory Statements

Murphy also challenges the admission of the two inculpatory statements he made to the police after his arrest. The facts surrounding these statements may be stated briefly. On February 4, 1980, Deputy Robinson arrested Murphy and properly gave him the customary *Miranda* warnings. Because West Virginia has a prompt presentment statute, Murphy was brought before a Lewis County magistrate soon after his arrest. *See* W.Va.Code 62–1–6 (1977). After explaining to Murphy the charge against him, the possible penalties upon his conviction, and his *Miranda* rights, Magistrate Moody testified that he then asked Murphy

> if he understood that he had the right to have the assistance of counsel during criminal proceedings and if he could not afford counsel the state would supply counsel for him without any or with no cost to him. I asked him if he understood that no person could represent him, other than a lawyer during a trial of these charges and if he understood that if he decided to represent himself he could not later charge [that] he was deprived of a lawyer.

(JA 776). Murphy next indicated that he desired appointed counsel by marking the appropriate box on a standard West Virginia form.[5] At the conclusion of his appearance before the magistrate, Murphy was escorted to Robinson's police car for transportation to the Braxton County Jail. On his way to the police car, Murphy continued

to protest his innocence while also indicating to Robinson that he wanted to talk.

Robinson told Murphy that he could not discuss anything with him unless he signed a waiver of rights form. Robinson then explained to Murphy his *Miranda* rights and asked him to sign the waiver of rights form. At trial, Murphy admitted that he signed the waiver form, that he understood his rights, and that he realized what the effect of waiver would be when he signed the form. Shortly after signing the waiver form, Murphy told Robinson: "I admit I stold [sic] the check out of the mailbox and cashed it, but I didn't kill her." (JA 621). The trial court found that Murphy's waiver was made knowingly, voluntarily, and intelligently. Murphy also informed Robinson that he and Dana Cutright had together planned the check theft and executed the plan, but when Dennison discovered that they had stolen her check, Cutright killed her to prevent anyone from learning of their theft. (JA 730).

Acting on these statements by Murphy, the police arrested Dana Cutright for the murder of Patricia Dennison. The individual arrested by the police, however, was not the right Dana Cutright. As a result, when the police later arrested the second Dana Cutright, they brought Murphy to the Braxton County Jail lobby to identify their suspect. Murphy confirmed that the police had the right Dana Cutright this time but as he was being led away from the lobby he confessed by blurting out: "Alright, I did it. Dana didn't have anything to do with it". (JA 734).

Despite his apparent waiver of rights, Murphy asserts that the admission of these two incriminating statements violated his sixth amendment right to counsel and his fifth amendment protection against compulsory self-incrimination which also includes the right to counsel. We find little merit to these arguments.

---

5. The standard West Virginia right to counsel form used by Magistrate Moody gave Murphy three options: "I've given up the right to have counsel; I want counsel appointed for me; or I have counsel to represent me." (JA 776–77). Murphy chose the second option and signed the form.

480

## A.

### First Statement

 The Supreme Court has long recognized that "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977) (footnote omitted). Under West Virginia law, Murphy's initial appearance before the Lewis County magistrate was an adversary criminal proceeding at which point his sixth amendment right to counsel attached. *State v. Sheppard*, 310 S.E.2d 173, 181 (W.Va.1983) (interpreting W.Va.Code § 62–1–6 (1977)). Equally significant, "[u]nlike the fifth amendment right, the sixth amendment right does not depend on an explicit request [for counsel] by the defendant." *United States v. Karr*, 742 F.2d 493, 495 (9th Cir.1984). Rather, like the vigilant guardian who never sleeps nor strays from his station, the sixth amendment right to counsel is automatically invoked as soon as adversary proceedings begin without any assertion of that right by the accused. Nevertheless, an accused may waive his rights under the sixth and fourteenth amendments at any time and for any reason. *Brewer*, 430 U.S. at 405–06, 97 S.Ct. at 1242–43. This is the most—if not only—sensible rule. An accused must be permitted to waive his right to counsel because

> [n]either the privilege against self-incrimination nor the right to counsel was designed affirmatively to encourage sealed lips. They were intended, at least in part, to protect the innocent (as well as

the guilty) from immoral and unethical methods, incompatible with humane law enforcement, which act as stimuli for confessions.

*United States v. Drummond*, 354 F.2d 132, 144 (2d Cir.1965), *cert. denied*, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966). "Indeed, far from prohibited by the Constitution, admissions of guilt by wrongdoers," if made voluntarily, knowingly, and intelligently, "are inherently desirable." *United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977). Here, Murphy signed a waiver of rights form prior to any custodial interrogation by the Braxton County Police.[6] If that waiver is constitutionally valid, the admission of Murphy's challenged statement elicited by Deputy Robinson did not violate his sixth amendment right to counsel.

Courts are in general agreement that the underlying *test* for a valid "waiver of the fifth and sixth amendment rights to counsel is the same: the waiver must be (1) voluntary, and (2) a knowing and intelligent relinquishment of a known right or privilege." *Karr*, 742 F.2d at 495; *accord Tinsley v. Purvis*, 731 F.2d 791, 794 (11th Cir.1984); *compare Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (waiver of fifth amendment right to counsel must be both "voluntary" and "a knowing and intelligent relinquishment or abandonment of a known right or privilege") *with Brewer*, 430 U.S. at 404, 97 S.Ct. at 1242 (waiver of sixth amendment right to counsel must constitute "'an intentional relinquishment or abandonment of a known right or privilege'" so that there is both "comprehen-

---

6. The waiver of rights form signed by Murphy is reproduced below:

#### YOUR RIGHTS

Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning, if you wish one.

#### CONSENT TO BE QUESTIONED

After the warning and in order to secure the consent to be questioned, the following questions should be asked and an affirmative reply secured to each question:

1. Do you understand each of these rights I have explained to you? Answer ____.
2. Having these rights in mind, do you wish to talk to us now? Answer ____.

Signed: _____

(State's Exhibit No. 32). Murphy answered each question in the affirmative by writing yes in the blank provided and initialing it. He also signed his full name in the blank provided.

sion" and "relinquishment" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461 (1938))). Nevertheless, the courts have been unable to agree regarding what specific *warnings* must be given the accused before a knowing and intelligent waiver of the sixth amendment right to counsel may be found.

The Ninth, Eleventh, Sixth, and Third Circuits have adopted the most lenient view by holding that *Miranda* warnings alone are sufficient to find a valid waiver of the sixth amendment right to counsel. *Karr*, 742 F.2d at 496 (9th Cir.); *Tinsley*, 731 F.2d at 793–94 (11th Cir.); *United States v. Woods*, 613 F.2d 629, 634 (6th Cir.), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980); *United States v. Cobbs*, 481 F.2d 196, 199 (3d Cir.) (decision rendered before *Edwards* and *Brewer*), *cert. denied*, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973). The Fifth Circuit's position is somewhat uncertain. It now "requires more than a recital of *Miranda* rights" to show a waiver of the sixth amendment right to counsel because "the state must prove not only that a defendant understood his right to counsel but that he relinquished it." *Felder v. McCotter*, 765 F.2d 1245, 1250 (5th Cir.1985); *accord United States v. Shaw*, 701 F.2d 367, 380 (5th Cir.1983); *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). It is, of course, also true that a mere recital of the *Miranda* warnings is not enough for a fifth amendment waiver since *Edwards* likewise requires an "intelligent relinquishment or abandonment of a known right or privilege." 451 U.S. at 482, 101 S.Ct. at 1884. It is unclear, therefore, whether the Fifth Circuit actually requires more to establish waiver under the sixth amendment than the fifth amendment. *See, e.g., Jordan v. Watkins*, 681 F.2d 1067, 1075 (5th Cir.1982) (same facts and circumstances supporting fifth amendment waiver also supported sixth amendment waiver); *United States v. Brown*, 569 F.2d 236, 239 (5th Cir.1978) (sixth amendment waiver found solely on the basis that defendant signed a *Miranda* waiver form). The Seventh Circuit has followed a case-by-case approach in determining whether a valid sixth amendment waiver has occurred. *Robinson v. Percy*, 738 F.2d 214, 222 (7th Cir. 1984) ("whether the accused has waived his sixth amendment right depends on the individual circumstances"). A valid sixth amendment waiver was found in *Robinson* where the defendant had been given *Miranda* warnings and the surrounding circumstances revealed that the "waiver was based on an adequate appreciation of the importance of representation by counsel." *Id.* Without endorsing a particular set of requirements for waiver, other circuits have found a valid sixth amendment waiver under different circumstances. *See Fields v. Wyrick*, 706 F.2d 879, 881–82 (8th Cir.) ("waiver of . . . the fifth or sixth amendment right to counsel is [valid and] judged by essentially the same standard" where defendant had been given *Miranda* warnings, had already invoked the right to counsel, and had the chance to consult counsel during interrogation), *cert. denied*, 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983); *United States v. Payton*, 615 F.2d 922, 924–25 (1st Cir.) (sixth amendment waiver valid where defendant was given *Miranda* warnings and was informed of indictment), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).

The Second Circuit has clearly adopted the most exacting standard. That strict standard permits nothing less than "a clear and explicit explanation of the sixth amendment rights defendant is giving up" before a valid waiver may be found. *United States v. Mohabir*, 624 F.2d 1140, 1150 (2d Cir.1980). To satisfy the Second Circuit's waiver requirements, "the content and significance" of the sixth amendment right to counsel must be fully explained to the accused by a neutral judicial officer. *Id.* at 1153. In addition, the judicial officer must show the indictment to the accused, explain its significance, and emphasize "the seriousness of his situation . . . should he decide to answer [police] questions . . . in the absence of counsel." *Id.*

The Fourth Circuit has not yet authoritatively decided what warnings are re-

quired to permit waiver of the sixth amendment right to counsel.[7] Nor do we decide that question now because the facts surrounding Murphy's waiver demonstrate that even the Second Circuit's exacting waiver requirements have been satisfied.[8]

■■ As the Second Circuit requires, Magistrate Moody, a neutral judicial officer, thoroughly explained to Murphy the charges against him, the possible penalties upon conviction, the gravity of his situation, and the nature of his right to counsel. Magistrate Moody related in detail what occurred at Murphy's appearance by testifying as follows:

I read the charges against Mr. Murphy and asked him if he understood them. He indicated that he did not and I went into the *best detail* that I could indicating that he is not actually guilty of what [he was] charged with, its just that the officers have reason to believe that that [he] had committed [the Dennison murder] and that he would have a right to a trial. And he indicated he understood that. . . .

*I indicated to him what the penalties would be if he was found guilty* of first degree murder, which is life, and I also indicated to him what the penalty would be of second degree murder, which is five to eighteen years . . . [I then] said now I'm going to go over [your *Miranda*] rights and it's very important that you understand and if there is anything you don't understand please stop

me and we'll go over it until you do understand.

(JA 648) (emphasis added). Magistrate Moody then read to Murphy the *Miranda* warnings. In response to Magistrate Moody's questioning, Murphy orally declared at least twice that he understood the rights that had just been read to him. (JA 648–49). He also signed the standard West Virginia *Miranda* form in several places indicating that he fully understood each *Miranda* warning. Finally, Magistrate Moody informed Murphy, as one of the *Miranda* warnings, that he had a right to counsel, a right to have counsel appointed if he could not afford one, that only a lawyer could represent him at trial, and that, if he represented himself, he could not later claim that he had been deprived of a lawyer. (JA 649). This colloquy between Magistrate Moody and Murphy lucidly reveals that—even under the strictest of standards—Murphy understood the "content and significance" of his sixth amendment right to counsel. *Mohabir*, 624 F.2d at 1153.

■■■ Thus, the only remaining question is whether Murphy *voluntarily* waived his sixth amendment rights. The trial court determined that Murphy voluntarily signed the waiver form. That finding of fact must be presumed correct. 28 U.S.C. § 2254(d) (1982); *Sumner v. Mata*, 449 U.S. 539, 544–45, 101 S.Ct. 764, 767–68, 66 L.Ed.2d 722 (1981). Since there is no evidence of even subtle coercion in the record,[9] the presumed correctness of the

---

7. The only Fourth Circuit decision that addressed the waiver issue was later vacated by the court sitting *en banc*. *See United States v. Clements*, 713 F.2d 1030, 1036 (4th Cir.1983) (waiver requires knowledge of indictment), *vacated by an equally divided court*, 728 F.2d 654 (4th Cir.1984) (en banc).

8. Admittedly, the Supreme Court may definitively resolve this waiver issue in its next term. *See Michigan v. Bladel*, 417 Mich. 885, 330 N.W.2d 846 (1983) (question presented: Are *Miranda* warnings sufficient to support sixth amendment waiver?), *cert. granted*, —— U.S. ——, 105 S.Ct. 2654, 86 L.Ed.2d 271 (1985). However, although the usual and better practice in such circumstances is to await the Court's resolution of the issue, we need not do so here,

because even under the strictest standard, Murphy waived his sixth amendment right to counsel.

9. Murphy initiated the conversation with Deputy Robinson that ultimately led to his waiver of rights. At trial, Murphy admitted that he signed the waiver form. (JA 691). He also conceded on cross-examination that he understood his rights when he signed the waiver form. (JA 833). Murphy's argument that Deputy Robinson's refusal to converse with him unless he signed the waiver somehow amounts to coercion is utterly unpersuasive. So long as the police have fully complied with their *Miranda* obligations by adequately informing the accused of his fifth and sixth amendment rights, they are under no affirmative obligation to supply the

trial court's finding that Murphy voluntarily signed the waiver form cannot be overcome. Despite the strong presumption against waiver,[10] the trial court's findings, the record, and Murphy's own testimony unquestionably reveal that Murphy validly waived his sixth amendment right to counsel. As a consequence, the admission of Murphy's statement to Deputy Robinson that Dana Cutright killed Patricia Dennison and that he, Murphy, merely stole Dennison's check did not violate his sixth amendment protection against uncounseled interrogation.

Murphy next insists that the admission of his first inculpatory statement violated his fifth amendment right to counsel. But because a sixth amendment waiver of counsel also necessarily constitutes a waiver of the fifth amendment right to counsel, the admission of Murphy's first inculpatory statement did not offend the fifth amendment.

A valid sixth amendment waiver of counsel *must* be sufficient for waiver of the fifth amendment right to counsel because, if anything, the sixth amendment right to counsel is broader than its fifth amendment counterpart. Although there is considerable overlap between the fifth and sixth amendment right to counsel, *see e.g., United States v. Lilla*, 534 F.Supp. 1247, 1279–81 (N.D.N.Y.1982), *rev'd in part on other grounds*, 699 F.2d 99 (2d Cir.1983), once the sixth amendment right

to counsel attaches by the initiation of adversary judicial proceedings, an accused is afforded greater protection under the sixth amendment. *United States v. Muzychka*, 725 F.2d 1061, 1069 (3d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984). This is so because (1) the sixth amendment's "deliberately elicited" test is more inclusive than the fifth amendment's "custodial interrogation" requirement, *id.* at 1065 n. 3, and (2) the sixth amendment right to counsel, unlike the fifth, is automatically invoked without a specific request by the accused. *Karr*, 742 F.2d at 495.

It is abundantly clear, therefore, that the standard for waiver of the sixth amendment right to counsel is at least as stringent as that for the fifth amendment. Since we have already concluded that Murphy validly waived his sixth amendment right to counsel, it necessarily follows that Murphy also waived his fifth amendment protections before partially confessing that his wrongdoing was limited to the theft of Dennison's welfare check.[11]

### B.

### Second Statement

Murphy claims that—even if he validly waived his rights—the waiver had lapsed by the time he confessed that he murdered Dennison in the Braxton County Jail lobby so that the admission of this statement violated both his fifth and sixth amendment right to counsel. However, we

accused with additional information. If the police so choose, they may remain, like the accused, perfectly silent after an arrest.

10. The Supreme Court has justly admonished that courts must "indulge" in every reasonable presumption against waiver." *Brewer*, 430 U.S. at 404, 97 S.Ct. at 1242. But the facts in this case are a far cry from those in *Brewer* in which the Court refused to find waiver. *See id.* at 404–05, 97 S.Ct. at 1242–43. In *Brewer*, the police told the defendant, who they knew was deeply religious, that the parents of the little girl he had allegedly murdered might never be able to give her a Christian burial unless he directed them to her body before it began to snow that night. *Id.* at 392–93, 97 S.Ct. at 1236–37. Overcome by his religious convictions, which were obviously stirred by the "Christian burial

speech," the defendant in *Brewer* directed the police to the location of the little girl's body. *Id.* at 393, 97 S.Ct. at 1236. Unlike the Christian burial speech in *Brewer*, Deputy Robinson did not initiate his conversation with Murphy, nor did he surreptitiously seek to elicit incriminating responses from Murphy, and most important, he obtained a written relinquishment of rights from Murphy before questioning him.

11. By holding that Murphy validly waived his fifth amendment rights, we express no opinion as to whether Murphy's request for appointed counsel before Magistrate Moody constituted an invocation of his fifth amendment right to counsel. That more difficult issue need not be addressed here and may be left for another day in light of our resolution of the waiver question.

need not reach the issue of lapse because the trial court correctly found that Murphy's confession was "without stimulus" and completely "spontaneous." (JA 700–01). The evidence reveals that, without any solicitation by the police, Murphy blurted out his confession immediately after having identified Cutright. The fifth amendment rights safeguarded by *Miranda,* including the right to counsel, only come into play when a defendant "in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291 at 300–01, 100 S.Ct. 1682 at 1689, 64 L.Ed.2d 297 (1980). Likewise, although a slightly different test is used, the sixth amendment right to counsel only applies to confessions "deliberately elicited" by the police. *United States v. Henry,* 447 U.S. 264, 272, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980); *Massiah v. U.S.,* 377 U.S. 201 at 206, 84 S.Ct. 1199 at 1203, 12 L.Ed.2d 246 (1964); *United States v. Peoples,* 748 F.2d 934, 936 (4th Cir.1984); *accord Wilson v. Henderson,* 742 F.2d 741, 746–47 (2d Cir.1984); *United States v. Vitale,* 728 F.2d 1090, 1092 (8th Cir.1984). Absent some form of interrogation or conduct designed to elicit incriminating responses, whether direct or disguised, neither the fifth nor the sixth amendment can be invoked to shield an accused from the effects of his uncounseled confession. *Edwards,* 451 U.S. at 485–86, 101 S.Ct. at 1885–86 (fifth amendment); *Brewer,* 430 U.S. at 401, 97 S.Ct. at 1240 (sixth amendment). Since Murphy's volunteered confession at the Braxton County Jail was made out of the blue and not as a result of police interrogation, we hold that the trial court properly admitted it into evidence.[12]

To summarize, we are persuaded that the trial court's jury instructions on reasonable

doubt did not violate Murphy's right to due process and that the admission of his challenged confessions did not violate either his fifth or sixth amendment right to counsel. The police meticulously observed Murphy's fifth and sixth amendment rights during interrogation and he was in every way afforded a fair trial. This is all the Constitution requires and is all that any court can provide. Accordingly, the district court's denial of the writ is hereby

AFFIRMED.

---

12. A different situation would exist, of course, if the police had no justifiable reason to bring Murphy to the Braxton County Jail lobby to identify Dana Cutright. Under these facts, we might be concerned that the police were attempting—or at least hoping—through subterfuge to elicit incriminating statements from Murphy. There is no evidence, however, that Murphy was taken to the jail lobby for any reason other than the legitimate one of identifying Dana Cutright. Murphy had claimed that

Cutright murdered Dennison. Surprisingly enough, the first suspect that the police arrested with the name of Dana Cutright turned out to be the wrong person. As a result, the police needed Murphy to confirm that their second Dana Cutright was in fact the person he had alleged killed Dennison. By having Murphy identify the second Dana Cutright suspect, the police were only seeking to ensure that they had not, as before, arrested an innocent man.