**Johnny Lee LOVE, Petitioner-Appellant,**

**v.**

**Warren YOUNG, Respondent-Appellee.**

**No. 84–1747.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1985.

Decided Jan. 27, 1986.

---

Ronald J. Rychlak, Jenner & Block, Chicago, Ill., for petitioner-appellant.

John J. Glinski, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellee.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.*

PER CURIAM.

Johnny Lee Love was convicted before a jury in a Wisconsin trial court of first degree sexual assault. The Wisconsin Appellate Court, in an unpublished opinion, affirmed his conviction and the Supreme Court of Wisconsin denied certiorari. Love then sought review of his conviction in the United States District Court for the Western District of Wisconsin, but that court denied his petition for habeas corpus. We affirm.

I

In the early morning hours of January 2, 1977, two men raped a young woman in Madison, Wisconsin. The men initially called to the woman from an apartment building and, after she walked away, assaulted her with a knife. The two men restrained the woman, forcing her to walk across a well-lit parking lot and onto a small porch behind an apartment building where they raped her at knifepoint. The victim gave the police accurate descriptions of her two assailants within 30 minutes after the assault. That afternoon the victim identified Love's photograph from a book containing approximately 50 to 60 photographs. On the back of each photograph was the name, date of birth, height, weight, and "sex background" of the subject. On the back of Love's photograph

_____

* Circuit Judge Coffey heard oral argument in this case but later recused himself.

was: "Suspicion of rape at 121 West Gilman Street, 11/28/76, on parole for rape." The victim was assaulted behind 121 West Gilman Street. At trial, the victim testified that she did not look at the writing on the back of the photographs before she identified Love's photograph. She did testify, though, that after identifying Love she looked at the back of the photograph and recalled seeing his name and nothing else. Detective Mary Ostrander, who conducted the identification session, testified that although the victim could have seen the writing before looking at the photograph, the victim "didn't pay any attention to the names. She just flipped through the pictures." When she identified the photo of Love the victim stated: "that looks like the man except he doesn't have any facial hair." When the victim later was shown a different picture of Love without facial hair, she identified him without hesitation as her assailant.

Love was arrested on January 3, 1977, on an unrelated charge of battery, and arraigned on January 11, 1977, for the rape. An attorney was appointed to represent him. Two days later, while in jail, Love was interviewed by Detective Lombardo. Love denied any knowledge of the attack but made statements about his activities on the evening in question that are inconsistent with the testimony he gave at trial. Love told Lombardo that he always wore an earring "while out socializing" and that the only man he spoke to in a Greek restaurant on the night of the attack was black.

Prior to the preliminary hearing, Love moved for an out-of-court or an in-court line-up. This motion was denied. At the preliminary hearing, the victim saw Love for the first time since the rape and positively identified him as one of her attackers. Love was the only black man in the courtroom at the time.

At trial, in response to a question regarding the identification process, Detective Ostrander stated: "Yes. I took her to our Detective Bureau, where we have a permanent file of sex offenders, and she went through the entire file." Love's counsel immediately moved for a mistrial; this motion was denied. At trial, Love testified that he spoke briefly with a white male at a Greek restaurant on the night of the rape and that he was not wearing an earring on that night. On rebuttal, Detective Lombardo contradicted Love's testimony and testified that when he interviewed Love shortly after his arrest Love had told him that he (Love) always wore an earring "while out socializing" and that he (Love) had spoken only with a black man at the Greek restaurant.

At the end of trial, Love's attorney submitted a proposed jury instruction on eyewitness identification. The trial court declined to give this instruction and instead gave the standard Wisconsin pattern instruction on credibility of witnesses. Further facts concerning the evidence introduced at trial will be detailed later in this opinion.

Love now raises the following issues: (1) whether the out-of-court photograph array identification and the identification procedure at the preliminary hearing were impermissibly suggestive and denied Love his Fourteenth Amendment right to due process of law; (2) whether Detective Ostrander's statement at trial that she took the victim to the Detective Bureau, "where we have a permanent file of sex offenders," rendered the trial fundamentally unfair; (3) whether the admission at trial of Love's statements to Detective Lombardo, taken without the presence of Love's counsel, violated Love's Sixth Amendment right to counsel, and if so, whether this error was harmless; and (4) whether the trial court's refusal to give Love's requested instruction on the eyewitness identification made the trial fundamentally unfair.

## II

### A. Identification Procedures

The victim identified Love as her assailant from a picture in a book of suspects. The backs of the pictures indicated the name, height, weight, date of birth, and "sex background" of each suspect. "Suspi-

cion of rape at 121 West Gilman Street, 11/28/76, on parole for rape," was written on the back of Love's photograph. The victim's initial confrontation of Love after the attack occurred during the preliminary hearing; at the time, Love was seated at the defense table and was the only black man in the courtroom. Love argues that both the photographic and in-court procedures used to identify him were unduly suggestive and thus violated his Fourteenth Amendment right to due process.

Relying on the victim's testimony that she did not see the written description on the back of Love's picture and Detective Ostrander's testimony that the victim paid no attention to the written inscriptions before identifying Love as the assailant, the Wisconsin Appellate Court found that the identification of Love in the photographic array was not impermissibly suggestive. The Wisconsin Appellate Court also held that the identification procedures employed at the preliminary hearing were extremely suggestive, but that the victim's identification of Love as her assailant was sufficiently reliable to satisfy any due process challenge. The district court concurred in each of these conclusions.

■ The basis of Love's Fourteenth Amendment due process claim is that the pre-trial identification procedures used by the state were so inherently unreliable that there was a substantial chance of misidentification. The analysis of Love's Four-

teenth Amendment due process claim involves two steps. Initially, it must be demonstrated that those procedures were unduly suggestive. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Griswold v. Greer,* 712 F.2d 1200, 1204 (7th Cir.1983). If the court finds that these procedures were unduly suggestive, it must then determine, considering the totality of the circumstances, whether the out-of-court identification was nevertheless reliable. *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253; *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972). The Wisconsin Appellate Court found that the photographic array was not unduly suggestive because the victim testified that she did not see the written inscriptions on the back of Love's photograph until after she had identified him. This finding of fact by a state court is entitled to a presumption of correctness. *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982). *Cf. Miller v. Fenton,* — U.S. ——, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985) (findings on subsidiary facts bind federal courts unless subject to challenge under statutory criteria). Love does not challenge this finding. If the victim did not see the written inscription, the photographic array was not unduly suggestive in practice, despite its potential for suggestiveness.[1]

---

1. Love argues that the inscriptions appearing on the back of these photographs were unduly suggestive in and of themselves, whether or not the victim saw the writing prior to making the identification. We do not understand the logic in this argument. If the victim did not see the writings on the back of the photograph until after she had identified Love as her assailant, then the identification of Love from the photographic array cannot be suggestive. Love does not seriously contend that the use of photographs, in and of themselves, to identify potential suspects is unduly suggestive. Indeed, the Supreme Court has approved of the use of a photographic array as a means to identify potential suspects. *See Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). This case is distinguishable from a situation where the state has failed to present evidence that the witness, who identified the

perpetrator from a photographic array, did not see the written inscriptions that could link the person in the picture to the crime. *See United States v. Archibald,* 734 F.2d 938, 940 (2d Cir. 1984) (held, in part, that the defendant, who was sought as a suspect for the armed robbery of a bank in Manhattan, was not denied due process even though the picture from which he was identified contained a written inscription indicating that he was arrested for a crime in the borough of Manhattan). Finally, even were we to assume, which we do not, that the photographic array procedure used by the Madison Wisconsin Police Department was unduly suggestive, it is clear that Love cannot demonstrate, as required by *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), that the victim's identification of Love was inherently unreliable.

■ Love next contends that the victim's in-court identification of Love as the assailant at the pretrial hearing was unduly suggestive because he was the only black person in the courtroom. Both the Wisconsin Appellate Court and the district court found that the in-court identification was unnecessarily suggestive,[2] but that, considering the totality of the circumstances (see *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 1972-73, 18 L.Ed.2d 1199 (1967)), the victim's identification of Love as her assailant was nevertheless reliable. *Cf. United States v. Bush*, 749 F.2d 1227, 1235 (7th Cir.1984) (Coffey, J., concurring). The factors that a court must consider when assessing whether the identification of the assailant is reliable, despite the suggestiveness of the identification procedures, are set forth in *Manson v. Brathwaite, supra:*

> These [factors] include the opportunity of the witness to view the criminal at the time of the crime, the witnesses's degree of attention, the accuracy of his prior description of the criminal, level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

432 U.S. at 114, 97 S.Ct. at 2253 (*citing Neil v. Biggers, supra*, 409 U.S. at 199-200, 93 S.Ct. at 382-83; *see also Griswold v. Greer, supra*, 712 F.2d at 1204. As we noted in *Griswold*, the lynchpin of the due process argument is the reliability of the identification itself. *Id.* at 1203. The ultimate determination whether the identification is reliable is a mixed question of law and fact; however, findings of subsidiary facts made by the state court (i.e., the opportunity of the witness to observe the suspect) are entitled to a presumption of correctness. *Griswold*, 712 F.2d at 1204. *See also Miller v. Fenton, supra*, 106 S.Ct. at 453. In this case, the Wisconsin Appellate Court found that the victim had a sufficient opportunity to observe her attackers.

The complainant was sexually assaulted in a well-lit parking lot. She first saw the defendant for about five seconds standing on a porch. She saw him again under a street lamp for about five seconds. She struggled with him and observed his face at that time for fifteen to twenty seconds. The rape itself took approximately a minute and a half, in a well-lit area. After the entire incident, the complainant spoke with her assailants for at least a few minutes.

After the rape occurred and Love had departed from the scene of the crime, he returned and, in a fit of anger, began "yelling at" the victim. The victim once more had ample opportunity to hear, see, and observe her attacker. The Wisconsin Appellate Court next found that the victim had paid close attention to the characteristics of her assailants during the assault.

> The complainant testified that she paid close attention to the identifying characteristics of her assailants. Her detailed testimony with respect to the events of the night attest to her attentiveness.

As the Wisconsin Appellate Court noted, "she was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." The Wisconsin Appellate Court also found that the victim gave the police an accurate description of the assailant.

> Within thirty minutes after the assault, the complainant gave police descriptions of her two assailants. She did testify that the police were getting the descriptions "mixed up," but her testimony clearly indicates that she herself never confused the identities. The description of one of her assailants matched the appearance of the defendant.

The Wisconsin Appellate Court further found that the victim was certain that Love was her assailant.

> As soon as the complainant was shown (in an array) a photo of the defendant without facial hair, she was unequivocal-

**2.** We need not reach the issue whether the pretrial preliminary hearing identification procedure was impermissibly suggestive. We address only the second prong of the analysis—namely, whether the circumstances surrounding the identification were nevertheless reliable.

ly certain of the identification. The only time the complainant was just "pretty sure" was when shown a picture of the defendant with facial hair during the first photo array. Since the defendant did not have facial hair at the time of the assault, this uncertainty was not surprising. The complainant was positive in her identification of the defendant at the preliminary hearing.

Finally, the Wisconsin Appellate Court noted that the period of time between the crime and the confrontation at the preliminary hearing was of such short duration that it did not obscure the victim's recollection of the events.

The preliminary hearing identification occurred only sixteen days after the assault. We have no doubt that this length of time was insufficient to blur the memory of the victim of this type of assault.

The record supports the Wisconsin Appellate Court's findings, and we agree with its conclusion that the victim's identification of Love as the assailant was reliable, proper, and trustworthy. Thus, we hold that the identification procedure at the preliminary hearing did not violate Love's due process rights under the Fourteenth Amendment.

B. Detective Ostrander's Statement

■ Love next contends that the admission of Detective Ostrander's statement at trial—that "1 took her [victim] to our Detective Bureau, where we have a permanent file of sex offenders, and she went through the entire file"—denied him a fair trial. Defense counsel moved for a mistrial after Detective Ostrander made this statement, arguing that the jury would inevitably link the photo array in which the victim found Love's picture with the "permanent file of sex offenders." The trial court denied this motion and, outside of the jury's presence, instructed the prosecutor not to pursue further questions concerning the photographic array. The Wisconsin Appellate Court held that the trial court did not abuse its discretion and that in any event the admission of Detective Ostrander's statement was harmless, as there was more than sufficient independent proof of

Love's guilt. The district court found that while Detective Ostrander's statement was not "harmless beyond a reasonable doubt," the utterance "was [not] material in the sense of a crucial, critical, highly significant factor in the outcome of the case" and thus Love was not denied a fair trial.

Love argues the admission of Ostrander's statement violated Wis.Stat. § 904.-04(2), which bars the reception of evidence concerning a person's character "for the purpose of proving that he acted in conformity therewith...." A writ of habeas corpus will issue only when an error in admitting evidence "is of such magnitude that the result is a denial of fundamental fairness." *United States ex rel. Palmer v. DeRobertis*, 738 F.2d 168, 170 (7th Cir. 1984). We scrutinize whether the evidence erroneously admitted at trial is "material in the sense of a crucial, critical, highly significant factor [in the outcome of the case]." *Williams v. Owens*, 731 F.2d 391, 392 (7th Cir.1983) (*citing Lawrence v. Wainwright*, 445 F.2d 281, 282 (5th Cir.1971)). The petitioner bears the burden of persuasion that the admission of this evidence rendered the trial fundamentally unfair. *United States ex rel. Shaw v. DeRobertis*, 755 F.2d 1279, 1281 n. 1 (7th Cir.1985).

Love has not convinced this court that the admission of Detective Ostrander's statement deprived him of a fair trial. As the district court observed, an astute juror could have associated the victim's testimony that she had selected Love's photograph from a photo array provided by Detective Ostrander with Detective Ostrander's statement that she had taken the victim "to our Detective Bureau, where we have a permanent file of sex offenders, and she went through the entire file." The court, however, believed that the potential prejudice was offset by the fact that the jury was excused immediately after the Detective's remark, and the line of questioning concerning the photographic array was not pursued when the trial resumed; any link between the victim's testimony and Ostrander's reference to a permanent file of sex offenders was never articulated. There

was no testimony that the victim had identified Love from a file in this "permanent file." We agree with the district court that these circumstances mitigate the potential prejudice of Detective Ostrander's testimony.

Moreover, a review of the record reveals that there was more than sufficient independent evidence to convict Love of the rape, and thus we are convinced that Ostrander's statement did not contribute to Love's conviction. The victim identified Love at trial and in the photographic array (on three separate occasions) as her assailant. The victim had ample opportunity to view Love before, during, and after the rape. The rape occurred adjacent to a well-lit parking lot, and Love's face was in clear view. The victim testified that immediately after the rape incident, Love spoke directly to her, and at that time the parking lot lights were illuminating his features. Love turned around and returned to the scene, after the victim had made a remark apparently construed by Love to be sarcastic, approached the victim and began "yelling at" her. The victim testified that she paid close attention to the features of each of her assailants because she intended to call the police immediately. In fact, the victim later told Detective Lombardo that her assailant wore a small, gold u-shaped earring in his left ear. When Love was arrested on January 3, 1977, one day after the rape, he was wearing a small, gold u-shaped earring in his left ear.

Love argues that some of the physical evidence presented at trial was exculpatory, noting that the seminal fluid found on the victim's clothing was not of Love's blood type, pubic hairs found on the victim were not from Love, and the footprints at the scene did not match Love's shoes. Thus, he contends, Detective Ostrander's statement must have had a substantial effect on the jury's determination of his guilt. Our review of the evidence discloses to the contrary that this evidence referred to was far from exculpatory. Karen Doerfer, an analyst from the Wisconsin Department of Justice Crime Laboratory, testified that the semen taken from various areas on the victim's clothing was blood type B and O. Love's blood type was O. Doerfer also explained that there is also a genetically distinct blood type called BO (as opposed to the usual blood types A, B, AB and O), although it is usually referred to as type B. The victim was raped by two assailants, and Doerfer stated that at the time of this incident it was possible for the two blood types, B and O, to combine, thus explaining the presence of both blood types on the victim's clothing. Love argues that it is unlikely that both blood types happened to mix in all samples taken from the victim's clothing, and thus the perpetrator of the crime must have had type BO blood. He confuses the expert's testimony, for Doerfer positively testified that both B and O, two separate blood types, were discovered on the victim's clothing. Thus, the blood type evidence supports the state's case that Love was a perpetrator.

Love also argues that the pubic hairs found near the victim's vagina, although determined to have been from a black person, were not consistent with his own pubic hairs. This evidence, however, does not exculpate Love because the victim testified that she was raped by two black men; the hairs could well have been from the second assailant. Finally, Love argues that the footprints found at the scene do not match his shoes. The comparison of his shoes, which he wore at trial, with the pictures of the shoe imprints found at the scene certainly falls far short of demonstrating that Love was not present in the parking lot on the night of the rape, as Love might very well have been wearing different shoes, or the police may not have recovered the proper shoe identification imprints from the scene as they might very well have been the imprints of the other assailant. Again this was a factual determination within the jury's realm.

Thus, after reviewing the record, including the victim's testimony concerning her ample opportunity to view and observe her attacker and her unshaken, positive testimony that Love was the rapist, we hold that the circumstances surrounding the im-

pact of Ostrander's single statement—that she took the victim to the Detective Bureau where the department has "a permanent file of sex offenders"—when viewed within the context of the entire trial of three days, was not of sufficient magnitude to deprive Love of a fair trial.[3]

## C. Admission of Lombardo's Testimony

■ On the date Love made his initial appearance in a Wisconsin trial court on the rape charge, an attorney was appointed to represent him. Two days later, on January 13, 1977, Detective Lombardo visited Love in the jail. Lombardo testified at the preliminary hearing that although he was aware that counsel had been appointed for Love, he neither knew the identity of Love's counsel prior to the interview nor knew that Love had been arraigned on the rape charge. (Love was arrested on January 3, 1977, on an unrelated battery charge and had been in the jail since then.) After identifying himself as a police officer, Detective Lombardo gave Love the *Miranda* warnings. Lombardo testified that Love told him that he (Love) understood his rights, that Love was aware that an attorney had been appointed to represent him on the rape charge, and that Love never indicated that he wished to have his counsel present.[4] In response to Detective Lom-

3. Love contends that the district court misapplied the standard of review when it found that admission of Detective Ostrander's statement was not "harmless beyond a reasonable doubt" but nonetheless found that the statement was "[not] material in the sense of a crucial, critical, highly significant factor" in the outcome of the case. Love contends that these are contradictory findings since an error, which is found not to be harmless, must necessarily render the trial fundamentally unfair. We need not reach the issue whether the district court confused these two standards, as the record demonstrates that Love has failed to meet his burden of establishing that Detective Ostrander's statement rendered his trial fundamentally unfair.

4. The text of Detective Lombardo's testimony concerning the *Miranda* warnings given to Love is as follows:

Q Now, did you, prior to the commencement of the interview, indicate to Mr. Love what his *Miranda* rights were?
A Yes, I did.
Q Did you read these to him?
A Yes, I did.
Q Do you have that card with you today?
A Yes.
Q I take it this is a standard Police Department card?
A Yes.
Q If you read it, it would have the standard warnings?
A Yes.
Q Now, did you in fact read that to Mr. Love?
A Yes, I did.
Q Was Mr. Miller, Detective Miller, in your presence?
A Yes.
Q At that time and place did Mr. Love indicate to you any uncertainty as to his understanding of those rights?
A No.
Q Did you question him in that regard?

A Yes, I did.
Q Did you have any doubt in your own mind whether or not he understood them?
A I don't have any doubt.
Q Did he appear to be coherent and lucid?
A Yes.
Q Did you have any difficulty speaking with him?
A No.
Q Did he at any time during this ensuing conversation indicate that he wanted not to talk to you any further?
A No.
Q Did he at any time ask for an attorney?
A No.
Q Did he tell you who his attorney was, if anyone?
A Yes.
Q And that was Mr. Burke, I take it?
A Yes.
Q Did you ask him, pursuant to your giving him the rights, if he wanted to talk to Mr. Burke first?
A Within the rights I—you know—
Q And did he at any time say, "I want to stop and talk to Mr. Burke"?
A No.
Q Or "I want to stop," period, or "I'd rather call him," or something like that?
A No.
Q Do you have any doubt in your own mind that he wanted to speak to his attorney at that time?
A No.
At trial, Detective Lombardo also testified that he gave Love *Miranda* warnings and that Love still wished to talk to the detectives.
Q Now, did you give, or Mr.—Detective Miller give, Mr. Love his *Miranda* warnings?
A Yes, I did.
Q What are those warnings?
A I read them off a card, his constitutional rights.
Q Can you tell me what they are if you've got the card with you? Either way?

bardo's questions, Love told Lombardo of his activities on the night in question and denied committing the rape. Love also stated that he always wore an earring "while out socializing" and that he was at a Greek restaurant at approximately 1:30 a.m. where he spoke briefly with a black man.[5] At the preliminary hearing, Love testified that Detective Lombardo never specifically asked him if he wished to have his court-appointed counsel present during the questioning. On the other hand Love neither denied the fact that Lombardo read him his *Miranda* warnings nor challenged or refuted Lombardo's characterization that he (Love) understood his rights and that he voluntarily answered his questions.

At trial, Love testified that on the night of the rape, he had visited several taverns in the Madison area and that he had ended up at a Greek restaurant before going home. While at this restaurant, Love stated that he briefly spoke with a Norman Marcus, a white male. Love further testified that he was not wearing an earring on that night. Norman Marcus testified next, stating that he saw Love at the Greek restaurant at approximately 1:20 a.m. to 1:40 a.m. on the night of the rape, briefly spoke to Love, and could not recall whether or not Love was wearing an earring that night. (The time is significant because the rape occurred between 1:30 a.m. and 2:00 a.m.) On rebuttal, the state called Detective Lombardo who testified that Love told him during the interview in the jail that "he always wears an earring when out socializing" and that he had spoken only to a black man while at the Greek restaurant. In surrebuttal Love testified that Lombardo had asked him "do [you] wear an earring," that he (Love) had answered yes and added "well, that Saturday night I wasn't wearing one."

In ruling on Love's post trial motion to overturn his conviction, the trial court stated that admission of Lombardo's testimony concerning the earring and the identity of the person with whom Love spoke at the Greek restaurant did not violate Love's Sixth Amendment right to counsel because "there is no question that defendant was advised of his rights, and waived them, prior to making the statement." On appeal to the Wisconsin Appellate Court, Love claimed that his Sixth Amendment right to counsel was violated when the trial court allowed Detective Lombardo to testify, because the police had failed to contact his attorney prior to questioning. Essentially, Love argued that without his counsel present during the questioning, he could not validly waive his right to counsel. The Wisconsin Appellate Court rejected this argument, *citing Schilling v. State*, 86 Wis.2d 69, 271 N.W.2d 631 (1978), which had rejected a similar argument.

The district court concluded that although the facts may demonstrate a valid waiver of Love's Fifth Amendment right against self-incrimination, the state had failed to demonstrate that Love waived his Sixth Amendment right to counsel. The district court stated that in order to show that Love had waived his Sixth Amendment right to counsel, the state would have to demonstrate that it had explained to Love "that counsel had already been appointed

A Sure can.
(Reading) Constitutional rights. One. You have the right to remain silent.
Two. Anything you say can and will be used against you in a court of law.
Three. You have the right to talk to a lawyer and have him present with you while you are being questioned.
Four. If you cannot afford to hire a lawyer, one will be appointed at county expense to represent you before any questioning if you so wish.
Five. You can decide at any time to exercise these rights and not answer any questions or make any statements.

And after every—every constitutional right, I asked him if he understood that specific right.
And on the other side it says: Do you understand each of these rights I've explained to you?
And we need an answer from him verbally, which he stated he did.
(Reading) Having these rights in mind, do you wish to talk to us now?
And he stated he did.

5. This restaurant is approximately two blocks from the scene of the rape.

for him and that he was entitled to consult with that counsel before deciding whether to respond to interrogation." The district court, however, found that the Sixth Amendment violation was harmless error because the impeaching effect of Lombardo's testimony at trial was oblique and slight, if it had any effect.

We need not reach the issue whether admission of Detective Lombardo's testimony was harmless error because we hold that Love waived his Sixth Amendment right to counsel. The Sixth Amendment right to counsel attaches once the adversary proceedings have commenced against the accused. *Maine v. Moulton,* — U.S. —, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985); *Robinson v. Percy,* 738 F.2d 214, 219 (7th Cir.1984) (*citing Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)). Since Love had been arraigned for the rape prior to Detective Lombardo's interview, the adversary proceedings had commenced, and his right to counsel had attached. Detective Lombardo's questioning therefore violated that right *unless* Love waived his right to coun-

sel. The Supreme Court has recognized that the right to counsel may be waived. In *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Court, after reviewing the "totality of the circumstances," held that the accused had not waived his right to counsel. *Id.* at 405–06, 97 S.Ct. at 1242–43.[6] Significantly, the Supreme Court stated that "[t]he Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." *Ibid.* (emphasis added).[7]

As with the waiver of the Fifth Amendment privilege against compulsory self-incrimination, waiver of the Sixth Amendment right to counsel depends on the defendant's " 'intentional relinquishment or abandonment of a known right or privilege.' " *Robinson v. Percy,* 738 F.2d 214, 222 (7th Cir.1984) (*quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *Edwards v.*

**6.** In *Brewer* the Court held that the defendant had not waived his Sixth Amendment right to have counsel present during interrogation that occurred while the defendant was being transported by authorities. The Court concluded that the state had failed to prove "an intentional relinquishment or abandonment of a known right" because the record disclosed that there had been an agreement between Williams' counsel and the authorities that no interrogation would take place during the trip and that despite this the authorities deliberately elicited incriminating statements from Williams without any "effort at all to ascertain whether Williams wished to relinquish that right." 430 U.S. at 405–06, 97 S.Ct. at 1243.

**7.** The Supreme Court has granted certiorari in *Michigan v. Bladel,* 421 Mich. 39, 365 N.W.2d 56 (1983), *cert. granted,* — U.S. —, 105 S.Ct. 2654, 86 L.Ed.2d 271 (1985), where one of the issues presented is whether the elements necessary to demonstrate a "knowing and intelligent" waiver of the Fifth Amendment right to counsel are sufficient to demonstrate a "knowing and intelligent" waiver of the Sixth Amendment right to counsel.

Three of the four Supreme Court cases to date that have found the defendant's Sixth Amendment right to counsel had been violated, where confessions introduced at trial were elicited by the police after the defendant had been indicted,

did not address the waiver issue since it was clear that the defendants did not know those statements could be used against them at trial. *See, e.g., Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (co-defendant, turned paid informant, employed by federal agents to gain incriminating admission from defendant); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (government plant of informer in jail cell to gain incriminating information from the defendant); *Maine v. Moulton, supra,* (although police had legitimate law enforcement objective in wiring co-defendant for sound in order to gather evidence against defendant for the crime of conspiracy of attempted murder, police also knew that defendant would in all probability discuss the theft charge for which defendant was previously indicted; thus, the admission of the tape recorded confession at the defendant's trial for theft violated his Sixth Amendment right to counsel). The only Supreme Court case to address the waiver issue held that there was no waiver in light of the investigating officer's conduct. *Brewer v. Williams, supra* (exploitation of defendant's religious scruples through use of the "Christian burial speech" to gain confession after police agreed not to question defendant without counsel present).

*Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981) (Fifth Amendment right to counsel). This circuit has analyzed the facts and circumstances of each case in determining whether there has been an "intentional relinquishment or abandonment of" the Sixth Amendment right to counsel. *Robinson,* 738 F.2d at 222. In *Robinson* the "defendant urge[d] the court to hold the Sixth Amendment requires police to give a criminal defendant additional warning beyond those mandated by *Miranda* before the defendant may waive his Sixth Amendment right to counsel." *Id.* Our court declined "to impose a rigid test for determining when the accused validly has waived his Sixth Amendment right to counsel. Rather, whether the accused has waived his Sixth Amendment right depends upon the individual circumstances of each case." *Id.* (*citing United States v. Springer,* 460 F.2d 1344, 1350–52 (7th Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972)). In *Robinson* the court determined that the state had demonstrated from the totality of the circumstances surrounding the defendant's confession that the defendant had validly waived his Sixth Amendment right to counsel. 738 F.2d at 222.

Here, the district court stated that Love could have waived his right to counsel only if he had first been advised "that counsel had already been appointed for him and that he was entitled to consult with that counsel before deciding whether to respond to interrogation." This court however, has never required, nor do we now require, that additional warnings beyond those recited in *Miranda* be provided to the accused. Rather, our approach is to determine whether under the totality of the circumstances there has been a valid waiver of the Sixth Amendment right to counsel.[8]

In order to establish a valid waiver of the constitutional right to assistance of counsel, the state must establish the accused was advised of that right, that he understood it, and that he voluntarily and intentionally relinquished it. *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. at 1023; *Robinson, supra,* 738 F.2d at 222. Detective Lombardo testified at the preliminary hearing and at trial that he fully advised Love, all too well acquainted with the Wisconsin criminal justice system, of his rights, including his right to counsel and his right to remain silent, prior to his questioning of Love and that Love indicated

---

**8.** Although this circuit has adopted a "case by case" approach in assessing the validity of defendant's waiver of his Sixth Amendment right to counsel, other circuits have adopted a clear cut, bright-line test. The Eleventh, Ninth, Eighth, Sixth, Third, and First Circuits have held that a waiver of the *Miranda* rights under the Fifth Amendment alone is sufficient to demonstrate a valid waiver of the separate Sixth Amendment right to counsel. *See Tinsley v. Purvis,* 731 F.2d 791 (11th Cir.1984); *United States v. Karr,* 742 F.2d 493, 496 (9th Cir.1984); *Fields v. Wyrick,* 706 F.2d 879, 880–81 (8th Cir.), *cert. denied,* 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983); *United States v. Woods,* 613 F.2d 629, 634 (6th Cir.), *cert. denied,* 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980); *United States v. Cobbs,* 481 F.2d 196, 199 (3d Cir.), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973) (pre-*Edwards* and *Brewer* decision); *United States v. Payton,* 615 F.2d 922, 924 (1st Cir.1980). *See also Fuentes v. Moran,* 733 F.2d 176 (1st Cir.1984); *cf. Burbine v. Moran,* 753 F.2d 178 (1st Cir.) (analyzing waiver claim under Fifth Amendment only), *cert. granted,* —— U.S. ——, 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985). The Second Circuit has imposed the

most restrictive requirements. *See United States v. Mohabir,* 624 F.2d 1140, 1150 (2d Cir. 1980) (significance of Sixth Amendment right to counsel must be explained to accused by judicial officer before there can be a valid waiver). The Fifth Circuit's position is unclear, although it apparently requires more than a demonstration of waiver of the *Miranda* right under the Fifth Amendment. *Compare Felder v. McCotter,* 765 F.2d 1245, 1250 (5th Cir.1985) (requiring more than a "recital of *Miranda* rights;" the state must demonstrate that the defendant not only understood his rights but also that he relinquished those rights voluntarily), *with Jordan v. Watkins,* 681 F.2d 1067, 1075 (5th Cir.1982) (waiver of Fifth Amendment rights is sufficient to establish waiver of the Sixth Amendment right to counsel). The Fourth Circuit has expressly disclaimed any intention to adopt a particular standard at this time. *Murphy v. Holland,* 776 F.2d 470 (4th Cir.1985). In *Murphy* the court stated that under the facts presented, the defendant waived his rights even under the most restrictive standard. *Id.* at 482 (*citing United States v. Mohabir,* 624 F.2d 1140, 1150 (2d Cir.1980)).

that he understood these rights. See note 4 for the full exchange.

So Love was advised of his right to counsel, understood this right, and voluntarily relinquished this right when he engaged in the interview with Lombardo. At the time of Lombardo's visit with Love, Love well knew that he was being held under an indictment for sexual assault and that he was represented by counsel. Love testified at trial that he had been arrested on three earlier occasions; in fact, at the time of his arrest for the rape, Love was on parole for a similar offense. Love was not a newcomer to the Wisconsin criminal justice system and was obviously quite familiar with the ins and outs of the judicial system. Finally, Love testified at the preliminary hearing and stated only that Detective Lombardo never had asked him if he wished to have his *appointed* counsel present during the questioning. Love made no attempt to rebut Detective Lombardo's characterization that he (Love) understood that he had the right to counsel and that he could remain silent and refuse to answer any of the questions.[9] Thus, the record establishes that Love knew that he had the right to counsel during the period of time Detective Lombardo questioned him.

The conduct of Love, and the detective's questions during the interview, reveal that Love voluntarily and intentionally relinquished this right to counsel. Love knew that the person he was speaking to in the jail was a police detective investigating the rape. The record discloses that Detective Lombardo never made any threats or false inducements or applied any pressure during the fifteen minutes that he spoke with Love. *See Brewer v. Williams, supra; cf. Massiah v. United States, supra.* During this interview, Love volunteered that he did not commit the rape and explained to Lombardo his whereabouts on the night in question. The nature of Love's answers to the questioning was exculpatory, as Love

offered to provide information that he hoped would clear him of the rape. This conduct demonstrates Love's willingness to participate in the investigation, in the hope that he might extricate himself from the rape charge, and thus Love voluntarily and willfully waived his right to counsel at that time with the purpose in mind that he might speak with the police. *See Tinsley, supra,* 731 F.2d at 796.

### D. Jury Instruction

■ The judge instructed the jury on the credibility of witnesses, pursuant to the approved Wisconsin Model Criminal Jury Instructions. Love had requested a specific instruction on eyewitness identification patterned after the instruction contained in *United States v. Telfaire,* 469 F.2d 552, 558–59 (D.C.Cir.1972). The *Telfaire* instruction lists three factors that the jury should consider in assessing eyewitness testimony: (1) whether the witness had the opportunity and capacity to observe the offender; (2) whether the identification was the product of the witness's own recollection; and (3) whether the witness was credible. This court has adopted a modified version of the *Telfaire* instruction for criminal trials in federal court. *See United States v. Anderson,* 739 F.2d 1254, 1257 n. 4 (7th Cir.1984). Love argues that such an instruction could have reduced the effect of the "suggestive" identification procedures used in this case and that the failure to give this instruction deprived him of a fair trial.

Because this case is before our court on a petition for habeas corpus relief, Love must demonstrate that the failure to give the requested jury instruction on eyewitness identification "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977); *see also United States*

---

9. At trial, Love testified that Detective Lombardo had read him the *Miranda* warnings. The fact that Detective Lombardo did not request that Love sign a form indicating that he (Love) understood his rights is not dispositive. *North*

*Carolina v. Butler,* 441 U.S. 369, 370, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1979); *United States v. Payton, supra,* 615 F.2d at 924; *Jordon, supra,* 681 F.2d at 1074.

*ex rel. Palmer v. DeRobertis,* 738 F.2d 168, 170 (7th Cir.1984). In rejecting Love's claim that the failure to specifically instruct the jury on eyewitness identification was error, the Wisconsin Appellate Court stated:

> Defendant made no challenge to the complainant's capacity to observe her attackers. Although defendant struggled to show that the lighting in the area was inadequate, and that the complainant had little opportunity to view her attackers, the record makes it abundantly clear that there was more than adequate light and an excellent opportunity for the complainant to view the two men who raped her.
>
> The identification made by the complainant was obviously the product of her own recollection. She identified a picture of defendant the afternoon of the day she was raped and other pictures of defendant within several days of that date. She was very positive in her recollection and, despite defendant's arguments to the contrary, the circumstances surrounding her identification of defendant were such that her own recollection is the only reasonable basis for her identification. The truthfulness of the complainant was never put in issue.

As the Wisconsin Appellate Court noted, the victim had ample opportunity to view her attacker before, during, and after the assault and was positive that Love was one of two rapists who assaulted her. *Telfaire* states that under such circumstances the failure to give a special eyewitness identification instruction does "not prejudice the appellant's defense." *Telfaire, supra,* 469 F.2d at 556–57. We agree. Since the victim in this case had ample opportunity to observe her attacker, and she testified in a clear, direct, unequivocal manner, the failure to give the *Telfaire* instruction certainly did not so "infect[ ] the entire trial that the resulting conviction violates due process." *Henderson, supra,* 431 U.S. at 154, 97 S.Ct. at 1737.

AFFIRMED.